UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


JAMES L. McCURRY,                    )
                                     )
            *Petitioner*,            )
v.                                   )          3:06-cv-332
                                     )          *Phillips*
                                     )
DAVID MILLS, Warden,                 )
                                     )
            *Respondent*.            )


## <u>MEMORANDUM</u>


     This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by

petitioner James L. McCurry ("McCurry").  The matter is before the court on the respondent's

answer to the petition and McCurry's reply.  For the following reasons, the petition for the

writ of habeas corpus will be **DENIED** and this action **DISMISSED WITH PREJUDICE**.


I.    <u>Standard of Review</u>


     Under Rule 8 of the Rules Governing Section 2254 Cases In The United States

District Courts, the court is to determine, after a review of the answer and the records of the

case, whether an evidentiary hearing is required.  If no hearing is required, the district judge

is to dispose of the case as justice dictates. If the record shows conclusively that McCurry is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.   Factual Background

The respondent has provided the court with copies of the relevant documents as to McCurry's direct appeal and post-conviction proceedings. [Court File No. 9, Notice of Filing Documents, Addenda 1-17]. McCurry was convicted by a jury, in the Circuit Court of Roane County, Tennessee, of one count of premeditated first degree murder and sentenced to life imprisonment. On direct appeal, McCurry alleged the evidence was insufficient to support the conviction. The appellate courts disagreed and affirmed the conviction. *State v. McCurry*, No. E2001-01900-CCA-R3-CD, 2002 WL 1020659 (Tenn. Crim. App. May 20, 2002) [Addendum 5], *perm. app. dismissed, id.* (Tenn. October 7, 2002) [Addendum 9], *perm. app. denied, id.* (Tenn. May 20, 2006) [Addendum 17].

The Tennessee Court of Criminal Appeals summarized the evidence against McCurry as follows:

> The Appellant and the victim, Brenda McCurry, married in 1994 and divorced in 1996. Notwithstanding their divorce, the Appellant and victim continued living together in an "off and on" relationship for the next two years. The victim was a real estate agent for Re/Max Realty Company in Kingston, Tennessee. Her co-workers testified that they had observed her at work with black eyes and finger marks around her neck. Despite repeated requests by the victim to leave her alone during their many separations, the Appellant

persisted in harassing his ex-wife, including telephoning her at work every day at "roughly five minute intervals."

On September 4, 1998, the parties again separated and the victim told the Appellant to leave their residence. On September 8, 1998, the victim obtained an ex parte order of protection based upon the following allegations:

> I have been divorced 2 years from [the Appellant]. I've tried to get him to leave me alone. I told him to leave Friday, September 4, 1998. I had to get my family to come so he would leave. He told me I had better get some insurance because I was going to need it. He has hit me before and threatened to hit me. He said I was going to be with him till I die. He stalks me and harasses me, calling all the time.

The Appellant left the parties' residence and moved to Taccoa, Georgia, to live with his sister, Valerie Murray. Ms. Murray described her brother during this period as "depressed and sad," explaining that he began "drinking heavily" and became "very resentful." Murray testified that the Appellant told her "more than once" that he was "going to buy a gun to kill [the victim]." On September 27, 1998, the Appellant purchased the pistol which he later used to kill his ex-wife.

Although the Appellant was aware of the protective order's no-contact provision, he continued to call, send packages, and contact the victim. On October 10, 1998, the Appellant purchased ammunition for the murder weapon. On October 12, 1998, the Appellant "decided that [he] would come to Tennessee and kill [the victim]."

Early the next morning, on October 13, 1998, the Appellant awoke, dressed in a suit and tie and drove 4 ½ hours from Taccoa, Georgia, to Kingston, Tennessee, where he entered the side door of the Re/Max Realty Company. At trial, the Appellant admitted that he wore a suit and carried a briefcase to conceal his pistol so he would not be noticed upon entering the building. As he entered the office, the victim and her co-worker, Peggy Giffin, were discussing a package the victim had just received by mail. The package contained cigarettes and a card signed by the Appellant. As the Appellant walked through the door of the office kitchen, he set his briefcase on the table. The Appellant removed the pistol from the briefcase and pointed it straight at the victim. In what Giffin described as a "cold, calm, [and] determined" manner, the Appellant shot the victim three times as the victim attempted to

flee to her office. The autopsy report determined the cause of death to be a gunshot wound to the victim's right temple.

As two other employees were calling for emergency assistance, the Appellant walked back to the office kitchen, placed the gun in his briefcase, left the building, and drove approximately 1200 miles from Kingston to Memphis, Tennessee, then through Mississippi, Alabama, and back to Georgia. As he drove, the Appellant disposed of his briefcase and the murder weapon in different locations.

The Appellant surrendered to law enforcement officers in Georgia and was returned to Tennessee.

*Id.*, 2002 WL 1020659 at **1-2.

McCurry then filed a petition for post-conviction relief, in which he alleged four instances of ineffective assistance of counsel. The petition was denied after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *McCurry v. State*, No. E2005-00350-CCA-R3-PC, 2006 WL 44043 (Tenn. Crim. App. January 9, 2006 [Addendum 15].

In support of his federal petition for the writ of habeas corpus, McCurry again alleges the evidence was insufficient to support the conviction as well as the four alleged instances of ineffective assistance of counsel. The respondent contends he is entitled to judgment as a matter of law as to each claim based upon the findings of the Tennessee state courts.

III.    State Court Findings

Pursuant to 28 U.S.C. § 2254(d), McCurry may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court.  In addition, findings of fact by a state court are presumed correct and McCurry must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1).  A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413.  A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*. at 411.

IV.    Discussion

*A. Sufficiency of the Evidence*

McCurry alleges the evidence was insufficient as a matter of law to support the conviction for first degree murder. McCurry specifically claims the evidence showed he was under a state of passion produced by provocation as well as under a state of medical illness, and thus could not have planned the killing nor appreciated the wrongfulness of his conduct.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, McCurry is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact.

6

*United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

The Tennessee Court of Criminal Appeals on direct appeal considered McCurry's claim of insufficient evidence. The appellate court first articulated the standard for challenging the sufficiency of the evidence to support a conviction:

> The Appellant argues that the evidence presented at trial is insufficient to support his conviction for premeditated first degree murder. Instead, he contends that the evidence presented supports a conviction for voluntary manslaughter because the Appellant acted out of "passion and provocation." We disagree.
>
> A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.

*State v. McCurry*, 2002 WL 1020659 at *2 (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)) (other internal citations omitted).

7

The court then stated the proof required under Tennessee law to convict a defendant of first degree murder:

> As charged in the indictment in this case, in order to convict the Appellant of first degree murder, the State was required to prove that the homicide was the result of "a premeditated and intentional killing of another." Premeditation is defined as follows:
>
>> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id*. at **2-3 (quoting Tenn. Code Ann. § 39-13-202(a)(1) and (d)) (internal citations omitted).

The court next summarized petitioner's challenge to the sufficiency of the evidence:

> The Appellant argues that the proof supports only a conviction for voluntary manslaughter, which is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."
>
> On appeal, the Appellant contends that his "state of passion" was produced by the "adequate provocation of financial and emotional ruin caused [him] by the victim." He specifically argues such provocation "triggered anger and helplessness [and blew] large holes in [his] reasoning ability." Again, in apparent support of this argument, the Appellant asserts that "from the beginning of [his] relationship with the victim, and to its very end, [he] had been transformed from a man who was financially sound to one in bankruptcy, in great part due to the action of the victim," whom he characterized as "domineering." We find the Appellant's argument flawed for several reasons.

*Id*. at *3 (quoting Tenn. Code Ann. § 39-13-211(a)).

8

The Tennessee Court of Criminal Appeals then considered and rejected McCurry's arguments:

First, the Appellant concedes on appeal that the victim's death was premeditated and intentional. Nonetheless, relying upon the authority of *Toler v. State*, 152 Tenn. 1, 260 S.W. 134, 137 (Tenn.1923), he argues that a manslaughter conviction may be proper even though proof of premeditation is found. In *Toler*, our supreme court held:

> It is not necessary to reduce killing to manslaughter that the passion should be so great as to render the defendant incapable of deliberation or premeditation. If the circumstances be such as are calculated to produce such excitement and passion as would obscure the reason of an ordinary man and induce him, under such excitement and passion, to strike the blow that causes the death of the deceased, this will reduce the killing to manslaughter. *Seals v. State*, 62 Tenn. 459, 461-62 (1874).

We find the Appellant's reliance on *Toler* misplaced. As previously noted, premeditation, as required for a conviction for first degree murder, is defined in part as requiring "[t]he mental state of the accused at the time the accused allegedly decided to kill ... be ... sufficiently free from excitement and passion." Thus, under current law, premeditation by definition, excludes acts resulting from passion and excitement. Logically, a defendant who premeditates a homicide cannot be convicted of manslaughter. If the proof establishes that the homicide is both premeditated and intentional, the crime is first degree murder.

Second, passion on the part of the slayer, no matter how violent, will not relieve the slayer of responsibility for the homicide unless it is produced by "adequate provocation." If no provocation is found, the crime is murder. Anger which would reduce an unlawful homicide to the degree of voluntary manslaughter, must be anger produced by adequate provocation. The issue of what constitutes adequate provocation is a question of fact which must be decided under the particular facts of each case by the jury. When the evidence is conflicting, the jury must resolve these conflicts under proper instructions, and decide whether the homicide is murder or manslaughter. Thus, in this case, it was for the jury to determine whether the killing of the victim by the Appellant occurred in a state of passion produced by provocation or whether

the Appellant simply meant to violently end a long-standing hostility. In this case, evidence of premeditation is overwhelming: (1) the use of a deadly weapon upon an unarmed victim; (2) declarations by the Appellant of an intent to kill; (3) procurement of a weapon; (4) preparations before the killing for concealment of the crime; and (5) calmness immediately after the killing. Accordingly, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the Appellant's acts were premeditated and intentional. This issue is without merit.

*Id*. at *3 (quoting Tenn. Code Ann. § 39-13-202(d)) ( internal citations and footnote omitted).

This court has reviewed the transcript of McCurry's trial [Addendum 2, vol. 1-4, Transcript of Evidence at Trial, pp. 1-348] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record.

McCurry told his sister, Valerie Murray, that he was going to buy a gun to kill his ex-wife. [*Id*., Testimony of Valerie Murray, vol. 1, p. 10]. McCurry purchased the gun on September 27, 1998, some two weeks prior to the murder. [*Id*., Testimony of Investigator Paul Stinnett, vol. 2, p. 154]. McCurry admitted that he purchased the gun in September and bought ammunition for the gun on October 10, 1998, which was two days prior to the murder. [*Id*., Testimony of James L. McCurry, vol. 3, pp. 259, 264]. McCurry further admitted that on Oct. 12, 1998, he decided to come to Tennessee and kill his ex-wife. [*Id*. at 266]. According to McCurry, when he first walked into the Re/Max office and saw his ex-wife, he did not say a word, but just loaded the chamber of the gun and started firing. [*Id*. at 270-71]. The witnesses to the shooting testified as to McCurry's cold, calm demeanor both before and after the shooting. [*Id*., Testimony of Peggy Giffin, vol. 1, pp. 32-35; Testimony of Denise Fritts, vol. 1., p. 73].

The decision of the Tennessee Court of Appeals that the evidence was sufficient to support the conviction of premeditated first degree murder was neither contrary to, nor did it involve an unreasonable application of, federal law as established in *Jackson v. Virginia*. McCurry is not entitled to habeas relief on this claim.

### B. Ineffective Assistance of Counsel

McCurry alleges four instances of ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), McCurry must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

11

defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

McCurry alleges his attorney rendered ineffective assistance of counsel by failing to do the following: (1) pursue a pretrial motion to request bond; (2) file a pretrial motion for a change of venue; (3) file a pretrial motion to suppress McCurry's statement; and (4) move for funds to obtain an expert witness in order to proper put forth an defense based upon insanity and diminished capacity.

These were the same claims of ineffective assistance of counsel considered and rejected by the Tennessee Court of Criminal Appeals in post-conviction proceedings:

> The petitioner appeals the Roane County Criminal Court's denial of his petition for post-conviction relief from his conviction for first degree premeditated murder and resulting life sentence. He contends that he received the ineffective assistance of counsel because his trial attorney (1) failed to file a motion to suppress his statement to police; (2) failed to schedule a hearing to set bond; (3) failed to obtain a second psychological evaluation for him; and (4) failed to file a motion for change of venue. Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

*McCurry v. State*, 2006 WL 44043 at *1.

The appellate court first summarized the evidence at the post-conviction hearing, as well as the trial court's written order denying post-conviction relief:

> At the post-conviction evidentiary hearing, the petitioner testified that after the shooting, he turned himself in to Chip Angel, an attorney in Stephens

12

County, Georgia, who had represented him in a bankruptcy case. Angel contacted the Stephens County police, who took the petitioner to the Stephens County Jail on the morning of October 14, 1998. Angel told the petitioner not to talk to the police without counsel present, and Angel told the Stephens County Police not to ask the petitioner any questions without the petitioner's attorney. That night, Kingston police officers arrived in Georgia to drive the petitioner back to Tennessee. During the drive, the petitioner told the officers that he did not want to give a statement. The petitioner testified that the officers tricked him into talking to them by telling him that the victim's son would want to know why he shot her. The petitioner was crying and upset and again told the officers that he did not want to speak to them. However, he finally talked to them about the shooting. The next day, the officers showed the petitioner his statement, which they had written out for him. They did not ask him to sign it. He said that the State introduced the statement into evidence at trial.

The petitioner testified that the trial court appointed an attorney to represent him and that he met with his trial attorney soon after his arrest. They discussed the charge against him and possible sentences. The petitioner told his attorney that before the shooting, he had been depressed, unable to sleep, unable to eat, angry, and heard voices. However, he and his attorney never discussed any defenses. The petitioner told his attorney that he had given a statement to the police, but the attorney did not go over the statement with him and did not file a motion to suppress the statement. The petitioner did not have any prior convictions and told his attorney that he wanted to get out of jail. The attorney did not file a motion to set bond, and the petitioner stayed in jail until he went to trial. He said that if the trial court had set bond, he could have made bond with the assistance of family and friends. Upon his release from jail, the petitioner could have sought medical care, could have found witnesses to testify on his behalf, and could have hired an expert psychiatrist.

The petitioner testified that a Chattanooga doctor had prescribed Prozac for him but that he stopped taking the drug about one week before the shooting. The petitioner's attorney knew the petitioner had been taking Prozac for depression. In August 1999, ten months after the crime, the petitioner had a psychological evaluation. The petitioner was interviewed for one hour and did not take any psychological tests. The results of the evaluation showed the petitioner was competent to stand trial. The petitioner and his family talked with his attorney about getting a second psychological evaluation to determine if the petitioner was sane at the time of the crime, but the attorney did not think a second evaluation was necessary. The attorney never asked the petitioner

about his childhood or if he had prior psychological problems. To the petitioner's knowledge, his attorney never contacted his Chattanooga physician. The petitioner and his attorney discussed the fact that stopping Prozac abruptly could provide him with a possible defense to the crime, but his attorney did not investigate possible defenses. He stated that his father had been physically and mentally abusive, that he had fallen out of a swing as a child and had been knocked unconscious, and that he suffered head injuries in a car accident in the 1960s. He stated that voices told him to kill the victim but that he did not drive to Kingston on October 13, 1998, with the intent to kill her.

The petitioner did not believe he could get a fair trial in Roane County because the victim had been a life-long citizen and because there was extensive publicity about the case. Eight potential jurors were dismissed from the jury pool because they stated they could not be fair. The petitioner talked with his attorney about seeking a change of venue, but his attorney never filed a motion. Approximately one week before trial, the petitioner's attorney talked with him about pleading guilty and receiving a twenty-five-year sentence. On the day the petitioner was suppose to plead guilty, his attorney learned that a life sentence was mandatory and that the petitioner would be required to serve the sentence at eighty-five percent. The petitioner decided he had nothing to lose by going to trial and decided not to plead guilty.

On cross-examination, the petitioner acknowledged that he and his attorney discussed suppressing his statement and that parts of the statement regarding the petitioner's drug and alcohol use could have been helpful to the defense. The petitioner also acknowledged signing a waiver of rights form in Stephens County, Georgia and that his trial attorney talked with attorney Chip Angel. He stated that two witnesses saw him walk into the victim's office and shoot her, but he said that if his statement had been suppressed, the jury would not have learned that he confessed to killing the victim. He acknowledged that his defense at trial was that he was insane or suffered from diminished capacity at the time of the shooting, not that he did not shoot the victim. He acknowledged that he and his attorney talked about bond and that his attorney told him the amount would be high. He stated that his attorney did not tell him that the attorney had spoken to his family and that they had limited resources and limited willingness to hire another psychological expert. He admitted that he never told his attorney he heard voices or that his father abused him. He stated that he attended jury selection and that he did not request for any of the selected jurors to be excused. The petitioner acknowledged that the jurors swore they could decide his case fairly. On redirect examination, the petitioner

14

testified that he did not want any parts of his statement introduced into evidence at trial and that his attorney discouraged him from seeking bond.

Dr. Kenneth Anchor, a clinical psychologist, testified that he evaluated the petitioner's mental condition and reviewed the trial transcript, the petitioner's medical records, and the petitioner's post-conviction petition. On November 6, 2003, Dr. Anchor interviewed the petitioner for five hours and gave the petitioner psychological tests. He stated that the petitioner was cooperative but seemed withdrawn, detached, and fatigued and that the petitioner complained of nightmares, alcohol abuse, and hearing voices. The petitioner told Dr. Anchor that he drank eight to ten beers the night before the shooting and that on the morning of the shooting, he drank more than one quart of coffee. The petitioner told Dr. Anchor that at the time of the shooting, he was "focused entirely upon doing what the voices were instructing him to do."

Dr. Anchor testified that the results of the petitioner's psychological tests revealed that the petitioner was "seriously impaired," had a schizoid type of personality, and had major depressive disorder. An intelligence test revealed that the petitioner was in the "low average range," consistent with someone having an eighth-grade education. Further testing revealed that the petitioner had illogical or irrational beliefs, "marked cognitive or mental impairment," psychotic thought processes, and marginal mental alertness. Dr. Anchor concluded that it was "somewhat doubtful" the petitioner had been competent to stand trial and stated that the petitioner may have met the criteria for an insanity defense. On cross-examination, Dr. Anchor testified that the petitioner's actions before the shooting reflected that he had planned parts of the crime. He acknowledged that his conclusions differed with the petitioner's prior evaluation and acknowledged that the prior evaluation was done closer to the date of the crime. However, he said that no psychological testing was conducted on the petitioner. He stated that he had previously testified in court, mainly for defendants, and that his fee in this case would be a few thousand dollars.

The petitioner's trial attorney testified that he met with the petitioner shortly after the petitioner's arrest and that his notes revealed the meeting lasted two and one-half hours. Counsel filed a motion to set bond but did not request a hearing on the motion. The petitioner's bond would have been at least one hundred thousand dollars, and the petitioner's chances of raising the ten thousand dollars needed in order to be released would have been "virtually nil." The petitioner indicated to counsel that getting out of jail was not that important to him because the petitioner wanted to "build time." The petitioner

never told him that the petitioner would be able to find witnesses if he was released on bond.

Counsel testified that he discussed the petitioner's statement with him in detail. The petitioner had signed a waiver of rights form at 7:15 p.m. on October 14, 1998, in Stephens County, Georgia. Counsel talked with Chip Angel, and Angel never told him that the petitioner had invoked his right to counsel. The petitioner also did not tell his trial attorney that he had invoked his right to counsel. However, the petitioner told counsel that when he got to jail, he told officers that he did not want to speak with anyone. Counsel had no legal basis to attack the waiver of rights form and, therefore, did not file a motion to suppress the petitioner's statement. He said that some of what the petitioner said in the statement would have come out at trial anyway and that the defense wanted the jury to hear some of the statement to show that the petitioner suffered from diminished capacity.

Counsel testified that the petitioner had led him to believe that the petitioner was taking Prozac at the time of the shooting. However, when the petitioner testified at trial, he said that he had stopped taking the drug two or three days before the shooting and that he had not consumed any alcohol. The petitioner never told counsel that he had been abused by his father or that he heard voices. However, the petitioner was depressed, and counsel requested a psychological evaluation. According to the evaluation, the petitioner was competent and was not insane at the time of the crime. Counsel did not believe the trial court would allow a second evaluation, and counsel did not request one. Counsel could not find anyone to pay for a second, independent psychological evaluation. He stated that the petitioner did not seem to have any difficulty understanding the charge or potential sentences. The petitioner wrote down information about the crime and, other than a few misspellings, the petitioner's written sentences were coherent. He stated that the petitioner's case was not as highly publicized as some other murder trials, and he did not believe the trial court would grant a motion for change of venue. In the two years between the crime and the trial, there was no serious publicity about the case.

On cross-examination, counsel testified that he had been practicing law for about twenty-three years and that he met with the petitioner four or five times. He acknowledged that during the drive from Georgia to Tennessee, the petitioner was crying and upset. The petitioner told counsel that he did not read the waiver of rights form. Counsel stated that at least four potential jurors

admitted they could not give the petitioner a fair trial but that he and the State were able to select a fair and impartial jury.

In a written order, the post-conviction court denied relief. According to the order, the petitioner's attorney worked diligently on his case, and the petitioner misled counsel regarding his use of drugs and alcohol before the crime. Regarding the petitioner's statement to police, the post-conviction court determined that counsel discussed the petitioner's options with him, that a motion to suppress probably would have failed, and that there were portions of the statement that counsel and the petitioner wanted before the jury. As to bond, the court found "no evidence with which to believe that the release of the defendant on bond pending trial would have affected the outcome of the trial in any way." Regarding a second psychological evaluation, the court concluded that the petitioner withheld information from his attorney about his mental condition, that there were no private funds available for a second evaluation, and that another evaluation would not have affected the outcome of the case. Finally, as to a change of venue, the post-conviction court held that a request for change of venue would have been denied.

*Id*. at **1-5.

In analyzing McCurry's claims of ineffective assistance of counsel, the Tennessee Court of Criminal Appeals first noted the standard of review set forth in *Strickland*. "'To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense.'" *Id*. at *5 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The appellate court then rejected McCurry's arguments:

Regarding the petitioner's claim that his attorney failed to file a motion to suppress his statement to police, the attorney testified that he discussed the statement with the petitioner and that they wanted the jury to hear parts of the statement. Thus, the attorney's not filing a motion to suppress was a tactical decision. The attorney also testified that he did not file a motion to suppress because the petitioner had signed a written waiver of rights form. Although the

17

waiver of rights form is not in the record on appeal, the form was introduced into evidence at trial, and we take judicial notice of the record in the direct appeal of the petitioner's conviction. The waiver of rights form shows that the petitioner signed it on October 14, 1998, in Stephens County, Georgia and that two Kingston, Tennessee police officers witnessed the petitioner's signing the form. Sergeant Chris Woody of the Kingston Police Department testified at trial that he and two other officers drove the petitioner back to Kingston, and Sergeant Woody acknowledged that the petitioner was "talkative." The next day, Woody wrote down statements the petitioner had made during the trip. Our review of the petitioner's direct appeal record reveals that the State did not introduce Woody's written notes into evidence. However, Woody read from his notes some of the statements that the petitioner had made. He stated that the petitioner cried and seemed remorseful at times but acknowledged that the petitioner was able to speak clearly and communicate effectively. The petitioner's attorney testified that neither Chip Angel nor the petitioner told him that the petitioner had invoked his right to counsel. Thus, even if the petitioner's attorney had filed a motion to suppress, there is no evidence that the petitioner invoked his right to counsel or that the trial court would have granted the motion. The petitioner has failed to show that he received the ineffective assistance of counsel or that he was prejudiced by the attorney's not filing the motion.

As to the petitioner's claim that he received the ineffective assistance of counsel because his trial attorney failed to schedule a hearing to set bond, we agree with the post-conviction court that the petitioner has made no showing that his being on bond would have changed the outcome of his case. Regarding his attorney's failure to request a second psychological examination, the petitioner's attorney testified that the results of the first exam, which was conducted closer to the date of the crime than Dr. Anchor's exam, showed that the petitioner was sane and competent at the time of the crime. Moreover, Dr. Anchor did not testify at the post-conviction hearing that the petitioner was insane at the time of the crime or incompetent to stand trial, and the petitioner has failed to show that a second psychological evaluation would have changed the outcome of his case. Finally, as to the petitioner's claim that he received the ineffective assistance of counsel because his trial attorney failed to file a motion to change venue, the petitioner has presented no evidence to support his claim that excessive coverage in the media made him unable to receive a fair trial in Roane County. The petitioner has included the jury voir dire transcript in the appellate record. Our review of the transcript shows that nearly all of the potential jurors had heard about the petitioner's case through the media and that several stated they could not be fair. However, those

potential jurors were dismissed from the jury pool, and the petitioner has presented no evidence that the remaining jurors were tainted by the publicity in his case.

*Id*. at *6 (internal citations omitted). This court has reviewed the transcript of McCurry's post-conviction hearing [Addendum 11, vol. 1, Transcript of Evidence of Post-Conviction Hearing, pp. 1-137] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record.

McCurry was represented at trial by attorney Harold D. Balcom, Jr. Mr. Balcom testified that he and McCurry discussed the question of bond and decided to not pursue the motion, because bond would be high and McCurry had no one willing to post bond for him. [*Id*., Testimony of Harold D. Balcom, Jr., pp. 100-102]. McCurry admitted that he discussed the possibility of making bond with Mr. Balcom, who advised McCurry it would be set high in his case. [*Id*., Testimony of James L. McCurry, p. 48]. Under the circumstances, whether McCurry was released on bond or not would not have altered the outcome of the case, and Mr. Balcom's decision to not pursue a hearing on the motion for bond did not constitute ineffective assistance of counsel.

Mr. Balcom also discussed with McCurry the question of whether to file a motion for change of venue. Mr. Balcom advised McCurry that a change of venue would be almost impossible to obtain, and explained to McCurry the trial court's general position that a change of venue would not be granted unless it was impossible to pick a fair and reasonable jury. [*Id*., Testimony of Harold D. Balcom, Jr., p. 116]. McCurry acknowledged that his attorney informed him of the trial court's habit of trying to seat a jury in the county in

19

question, and then granting a change of venue if unable to do that. [*Id.*, Testimony of James L. McCurry, p. 53]. In fact, at the conclusion of the post-conviction hearing, the trial judge noted that he would not have granted a motion for change of venue, unless the court was not able to obtain an unbiased jury, which did not happen. [*Id.*, Statement of the Court, p. 141].

In any event, as McCurry admitted, the parties were able to seat a jury who swore on their oath that they could try the case fairly. [*Id.*, Testimony of James L. McCurry, pp. 53-54]. Mr. Balcom's decision to not file a motion for change of venue was not ineffective assistance of counsel. *See United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (the failure of defense counsel to pursue frivolous motions and objections cannot constitute ineffective assistance of counsel).

With respect to McCurry's claim that his attorney should have sought additional funds for another expert witness, there is no proof that a second psychological evaluation would have changed the outcome of the trial. Dr. Kenneth Anchor evaluated McCurry for purposes of post-conviction proceedings and testified, inter alia, as follows:

> Well it was clear that he has a long history of emotional instability and depression. Patients with similar profiles to Mr. McCurry have difficulty expressing emotions in a modulated, adaptive fashioning, and are often emotionally inappropriate. Impulse control may be poor. The patient tends to be overwhelmed by emotional turmoil or conflict, with even minor stressors upsetting him or overwhelming him. He is highly sensitive to any type of rejection.

[*Id.*, Testimony of Kenneth Anchor, p. 77]. Dr. Anchor concluded that, in light of the foregoing and McCurry's history of alcohol abuse and drug use, it was doubtful McCurry was competent to stand trial and may have, as well, met the criteria for an insanity defense. [*Id.*

20

at 79]. Dr. Anchor admitted, however, that the evaluation of McCurry prior to trial was done much closer in time to the event in question than Dr. Anchor's evaluation. [*Id*. at 90].

Mr. Balcom testified that McCurry never told him of the physical abuse he allegedly suffered at the hands of his father and never mentioned hearing voices. [*Id*., Testimony of Harold D. Balcom, Jr., p. 111]. In addition, Mr. Balcom knew that the trial judge would not authorize another evaluation of McCurry after he had been found competent to stand trial and sane at the time of the murder; Mr. Balcom also knew there was no family member who would pay for another evaluation. [*Id*. at 113-14]. McCurry admitted that he did not tell his attorney about the prior abuse by his father or about hearing voices. [*Id*., Testimony of James L. McCurry, pp. 50-52]. Mr. Balcom did not render ineffective assistance in this regard.

Finally, there is no evidence that a motion to suppress McCurry's statement would have been beneficial to the defense. Two eyewitnesses saw McCurry shoot his ex-wife. McCurry admitted that he and his attorney discussed whether to file a motion to suppress his statement and agreed that might not be a good thing to do, because there were parts of his statement they wanted to get into evidence. [*Id*. at 50]. Mr. Balcom confirmed that he and McCurry decided not to file a motion to suppress because they wanted parts of his statement admitted into evidence. [*Id*., Testimony of Harold D. Balcom, Jr., pp. 107-08]. Mr. Balcom's decision to not file a motion to suppress constituted trial strategy, which this court will not second-guess. Accordingly, Mr. Balcom did not render ineffective assistance of counsel in that regard.

As previously noted, this court reviewed the transcript of McCurry's trial. His attorney presented a spirited defense on behalf of McCurry. Unfortunately for McCurry, the evidence of guilt was more than sufficient to support a conviction for first degree murder. Based upon the foregoing, McCurry has failed to demonstrate he received ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*. He is not entitled to relief on this claim.

V.     Conclusion

The petition for habeas corpus relief will be **DENIED** and this action **DISMISSED**. Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts. McCurry having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** McCurry leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**

              s/ Thomas W. Phillips
              United States District Judge

22